## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*<br><br>**PATRIOT NATIONAL INC., *et al.*,**[1]<br><br>**Debtors.** | Chapter 11<br><br>Case No. 18-10189 (KG)<br><br>(Jointly Administered) |
| **CORPORATE CLAIMS MANAGEMENT, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**MICHELLE SHAIPER AND BRENTWOOD SERVICES ADMINISTRATORS, INC.,**<br><br>**Defendants.** | Adv. Proc. No. 18-_____ (___) |

### VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Corporate Claims Management, Inc. ("CCMI"), an above-captioned debtor in possession and Plaintiff, by and through its attorneys, for its complaint, alleges the following against Defendants Michelle Shaiper ("Shaiper") and Brentwood Services Administrators, Inc. ("Brentwood" and, together with Shaiper, "Defendants"):

---

1. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal identification number, are: Patriot National, Inc. (1376), Patriot Services, LLC (1695); TriGen Insurance Solutions, Inc. (2501); Patriot Captive Management, LLC (2341); Patriot Underwriters, Inc. (0045); TriGen Hospitality Group, Inc. (6557); Patriot Risk Consultants, LLC (0844); Patriot Audit Services, LLC (5793); Patriot Claim Services, Inc. (9147); Patriot Risk Services, Inc. (7189); Corporate Claims Management, Inc. (6760); CWIBenefits, Inc. (0204); Forza Lien, LLC (7153); Contego Investigative Services, Inc. (0330); Contego Services Group, LLC (0012); Patriot Care Management, LLC (2808); Radar Post-Closing Holding Company, Inc. (2049); Patriot Technology Solutions, LLC (6855); and Decision UR, LLC (1826). The Debtors' headquarters are located at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida 33301.

## INTRODUCTION

1.      This action arises out of a deliberate scheme by Shaiper, a former trusted high-level CCMI employee, to breach her non-solicitation agreement and usurp trade secrets and other confidential and proprietary information she obtained from CCMI to divert some of CCMI's most valuable customer relationships and employees to her new employer, Brentwood, a direct competitor of CCMI.

2.      Shaiper is now employed with Brentwood and using misappropriated information to, together with Brentwood, continue to attempt to steal CCMI's customers and employees.  Since December 2017, Shaiper and Brentwood have stolen (i) twenty-one CCMI employees—more than half of CCMI's workforce—and (ii) fourteen CCMI clients with total annual revenue of nearly $3.3 million, which is nearly half of CCMI's annual revenue.

3.      Unchecked, Defendants' corporate raid poses a substantial threat to CCMI.  These actions constitute theft of confidential business information and directly violate agreements binding on Shaiper.  They also constitute acts to obtain possession of or exercise control over property of the CCMI estate, in violation of section 362 of the Bankruptcy Code. Without this Court's relief, the unmistakable harm to CCMI's business and estate will continue, as Defendants are given additional time to further implement their scheme to solicit key CCMI customers and employees.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).

5.      This is a core proceeding under 28 U.S.C. § 157(b)(2) because, among other reasons, the proceeding seeks an order to turn over property of the estate.  Plaintiff consents to the entry of a final order or judgment by this Court.

2

6.     Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409

because the Debtor's chapter 11 case is pending in this judicial district.

**PARTIES**

7.     Plaintiff CCMI is a corporation organized and existing under the laws of

the State of Delaware with a principal place of business in St. Louis, Missouri.

8.     Defendant Shaiper is an individual who, upon information and belief,

resides in Missouri and is a citizen of that state.

9.     Defendant Brentwood is a corporation organized and existing under the

laws of Tennessee with a principal place of business in Brentwood, Tennessee.

**FACTUAL BACKGROUND**

**A.     CCMI and Its Business**

10.     CCMI was founded in 1992 to provide the risk management community

with custom-tailored, high-quality claims administrative services and risk management

information systems designed to the unique specifications of each client.

11.     Patriot National, Inc. acquired CCMI in April 2015 as part of its strategy

to expand the company's fee-based product offerings.

12.     The strength of CCMI's relationships with its customers is a key driver of

CCMI's business, and the employees of CCMI are integral to the creation and maintenance of

these customer relationships.

13.     CCMI invests substantial time, effort, and money into the development of

its workforce by, among other things, providing its personnel with in-depth training.  Through

these efforts and the associated significant investment of time and expense, CCMI provides its

workforce with a deep understanding of CCMI's services, confidential pricing information,

3

marketing plans, customer lists and contact information, customer requirements, and other confidential, proprietary, and trade secret information.

14.   The goodwill arising from the customer relationships developed between CCMI (through its workforce) and its customers belongs to CCMI, because it is the product of CCMI's significant investment.

**B.   Shaiper's Position as a Trusted Employee of CCMI**

15.   Shaiper was employed by CCMI or its predecessors from April 1996 through December 2017, based in CCMI's Chesterfield, Missouri office.

16.   On April 24, 2015, in connection with Patriot National, Inc.'s acquisition of CCMI, Shaiper executed the Employment Agreement and the Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Non-Interference Agreement"). *See* Ex. A.

17.   Prior to her resignation and termination in December 2017, Shaiper was the Chief Operations Officer of CCMI. In this role, she was responsible for, among other things, the oversight of CCMI's employees and some of CCMI's most important customer accounts.

18.   As a result of her trusted position at CCMI, Shaiper was privy to trade secret, confidential and proprietary information regarding CCMI's relationships with its customers and employees. This included the intricacies of CCMI's pricing, customer lists, customers' contractual terms, customer preferences, market opportunities, employee salary information, and employee scope of duties, among other trade secret, confidential, and proprietary information that is the property of CCMI.

19.   Shaiper was trusted to maintain and develop relationships with some of CCMI's most important customers, often interacting with customers daily. As a result, Shaiper learned significant details about the preference of these customers and understood what made

4

CCMI's services attractive to those customers. Likewise, Shaiper was trusted to oversee CCMI's employees, and through her role, learned details about the preferences of CCMI's employees and confidential information about their employment with CCMI.

20. Specifically, Shaiper knew which employees to solicit and raid from CCMI, how best to solicit CCMI's customers to transfer to Brentwood, and how to best utilize the protected information belonging to CCMI that she garnered while working for CCMI.

21. This trade secret, confidential, and proprietary information was developed by CCMI's substantial efforts, and significant dedication of time and resources.

**C.    The Importance of CCMI's Employees, Customer Relationships & Confidential Information and Shaiper's Agreement Not to Interfere**

22. The foundations for the success of CCMI's business are the established and ongoing relationships with its customers. CCMI does business in a highly competitive industry, and the strength of the relationships with its customers enables CCMI to compete in this environment. CCMI relies on its employees to nurture and manage these relationships effectively and in the best interests of the business.

23. In recognition of the importance of these customer and employee relationships, CCMI places a high value on its trade secrets, confidential, and proprietary information, and has policies in place in order to maintain the confidentiality of this information.

24. Accordingly, through the Non-Interference Agreement, Shaiper acknowledged that she would acquire confidential information and trade secrets during the course of her employment, and agreed to certain reasonable and necessary terms for the protection of CCMI's confidential information:

> I acknowledge that, during the course of my employment, I will have access to information about the Company and its direct and indirect subsidiaries (together with the Company, the "Company Group") and that my employment with the Company shall bring

5

me into close contact with confidential and proprietary information of the Company Group. In recognition of the foregoing, *I agree, at all times during the term of my employment with the Company and thereafter, to hold in confidence, and not to use, except for the benefit of the Company Group, or to disclose to any person, firm, corporation, or other entity without written authorization of the Company, any Confidential Information that I obtain or create*. I further agree not to make copies of such Confidential Information except as authorized by the Company or to otherwise perform my duties under the Employment Agreement. I understand that "Confidential Information" means information that the Company Group has or will develop, acquire, create, compile, discover, or own, that has value in or to the business of the Company Group that is not generally known and that the Company wishes to maintain as confidential. I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated business and/or products, research, or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets, customer lists, and customers (including, but not limited to, customers of the Company on whom I called or with whom I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Company property.

Ex. A, ¶ 1 (emphasis added).

25. In paragraph 5 of the Non-Interference Agreement, Shaiper expressly agreed, during her employment period, not to "directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities." Interfering Activities are defined as:

(A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any member of the Company Group to terminate such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Company Group; (B) hiring any individual who

was employed by the Company Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Business Relation[2] to cease doing business with or reduce the amount of business conducted with the Company Group, or in any way interfering with the relationship between any such Business Relation and the Company Group.

*See* Ex. A, ¶ 5.

26.　　Shaiper further agreed not to disparage CCMI in paragraph 5(d):

I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any member of the Company Group or their respective current or former directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any member of the Company Group or any conduct or events which precipitated any termination of my employment from any member of the Company Group. However, my obligations under this subparagraph (d) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

*See* Ex. A, ¶ 5(d).

27.　　Shaiper also agreed to the reasonableness of the obligations contained in

the Non-Interference Agreement in paragraph 6:

I acknowledge and recognize the highly competitive nature of the Company's business, that access to Confidential Information renders me special and unique within the Company's industry, and that I will have the opportunity to develop substantial relationships with existing and prospective clients, accounts, customers, consultants, contractors, investors, and strategic partners of the Company Group during the course of and as a result of my employment with the Company. In light of the foregoing, I recognize and acknowledge that the restrictions and limitations set forth in this Non-Interference Agreement are reasonable and valid in geographical and temporal scope and in all other respects and

---

2.　"Business Relation" is defined as "any current or prospective client, customer, licensee, supplier, or other business relation of the Company Group, or any such relation that was a client, customer, licensee or other business relation within the prior six (6) month period, in each case, to with whom I transaction business or whose identity became known to me in connection with my relationship with, or employment by, the Company."

are essential to protect the value of the business and assets of the Company Group. I further acknowledge that the restrictions and limitations set forth in this Non-Interference Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Company and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Company.

*See* Ex. A, ¶ 6.

28.     In paragraph 8 of the Non-Interference Agreement, Shaiper agreed that

CCMI is entitled to injunctive relief in the event Shaiper breached any of the terms of the Non-

Interference Agreement:

I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Non-Interference Agreement may result in substantial, continuing, and irreparable injury to the members of the Company Group. Therefore, I hereby agree that, in addition to any other remedy that may be available to the Company, any member of the Company Group shall be entitled to seek injunctive relief, specific performance, or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Non-Interference Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach and without the posting of a bond.

*See* Ex. A, ¶ 8.

29.     The terms of the Non-Interference Agreement are reasonable and

necessary to protect CCMI's legitimate interests.

**D.     While Still Employed by CCMI, Shaiper Surreptitiously Launches Plan to Raid CCMI's Employees and Customers For the Benefit of CCMI's Competitor, Brentwood**

30.     Upon information and belief, Shaiper planned her exit from CCMI well in

advance of her actual resignation date, and perfected her scheme to use the knowledge, insight,

and trade secrets obtained from CCMI in her pursuit of CCMI's existing clients and employees

while she was still employed by CCMI.

31.     In mid-December 2017, while still employed at CCMI, Shaiper held a meeting of the employees of CCMI to discuss her plan to steal CCMI's employees and customers. At that meeting, she acknowledged that she initiated her scheme to steal CCMI's customers and employees as early as December 1, 2017.

32.     Shaiper also announced her plan to resign and abscond with CCMI's trade secrets, customers, and employees. She informed the other employees of her "bigger plan" to "all be together as a team again":

> [J]ust know that there is a bigger plan, and I would like to see everybody part of that plan. I'm not going to say too much more about what the plan is, but you're all in our plan . . . There are people that are going to be here to continue to service our accounts until we figure out where we are all going to land together.
> . . .
> We have to try to keep our clients the best that we can, so we have to have some people that are going to move forward and try to retain those clients, maybe somewhere else, and people that stay here for a while and keep things alive and going until we can all be together as a team again. It just has to be somewhere else...
> . . .
> The idea is to get everybody to move over to where we're going, I don't know if that's [going to] happen, but I would say, get your resumes together because it'd be stupid not to.

33.     At that time, Shaiper made disparaging remarks about CCMI and its ability to continue in business. Shortly after the meeting, Shaiper tendered her resignation. On December 29, 2017, Shaiper was terminated for cause for violating the Non-Interference Agreement. Upon information and belief, Shaiper commenced employment at Brentwood in January 2018.

34.     Brentwood, like CCMI, is a provider of insurance-related services, including workers' compensation-related services. *See* Brentwood Services Administrators Overview, available at http://www.bwood.com/brentwood-services-administrators-overview (last accessed March 13, 2018). Brentwood is a competitor of CCMI.

9

## E.    Solicitation of CCMI Employees

35.    Upon information and belief, Shaiper, with the knowledge, consent and assistance of Brentwood, took affirmative steps to induce CCMI's employees to leave CCMI to work for its direct competitor, Brentwood, while she was still employed at CCMI, despite her contractual non-solicitation obligation.

36.    The employee raid of CCMI was successful.  Since December 2017, Defendants have apparently solicited and recruited *twenty-one* of CCMI's employees—more than half of CCMI's workforce.  Upon information and belief, Defendants continue to solicit CCMI employees to join Brentwood.  The sheer size and scope of the employee raid demonstrates that Defendants orchestrated the raid in an effort to eliminate CCMI's presence in the marketplace and its ability to provide services to its customers.

37.    In addition, Defendants induced these employees to leave en masse to bolster their efforts to illicitly steal CCMI's current and potential customers.  Defendants knew or should have known that CCMI's customers would be more inclined to transfer their business to Brentwood if CCMI was stripped of its workforce.  The unlawful employee raid has severely impacted CCMI's ability to conduct business, service its existing customers, and attract new customers.  At the same time, the employee raid bolstered Brentwood's efforts to illicitly steal CCMI's customers to CCMI's detriment.

## F.    Solicitation of CCMI's Customers

38.    Upon information and belief, prior to her departure from CCMI, Shaiper created a spreadsheet listing all of CCMI's clients, the status of their contracts, the renewal date on the contract, and the key terms of the contract.  Upon information and belief, with Brentwood's aid, Shaiper exploited this information to allow Brentwood to induce CCMI's customers to transfer their business to Brentwood.

10

39. Since December 2017, Shaiper has apparently caused *fourteen* former CCMI customers, with aggregate annual revenue of nearly $3.3 million, to terminate their relationships with CCMI and commence contracts with Brentwood.

40. Unless enjoined, Defendants' actions will cause irreparable harm. The risk of Defendants' activities to CCMI's business and long-term prospects are irreparable. Indeed, upon information and belief, it is inevitable that Shaiper is using and intends to continue to use CCMI's trade secret, confidential, and proprietary information at Brentwood, and in particular in her pursuit of CCMI's current customers and employees, in direct violation of the express terms of the Non-Interference Agreement.

41. Defendants have already and intend in the future to target CCMI's best employees and customers, using the information and insight Shaiper obtained through the course of her employment at CCMI. The loss of any customer or employee will adversely impact CCMI's business, and could lead to the erosion of customer confidence going forward (thereby threatening the goodwill that CCMI has built up over more than twenty years) and threaten the reorganization of CCMI through these chapter 11 cases.

42. Prompt action is necessary to prevent further damage to CCMI and its estate. Injunctive relief to enjoin Defendants from engaging in any activity designed to compete with CCMI, to solicit its employees or customers, or otherwise to disclose its confidential and proprietary information is the only reasonable means to prevent further irreparable harm to CCMI and the value of CCMI's estate.

DOCS_DE:218423.1 69353/002

# COUNT I
## (VIOLATION OF AUTOMATIC STAY, 11 U.S.C. § 362(a)(3) and (k))
### (Against Defendants)

43.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

44.     CCMI's trade secrets, confidential, and proprietary information, which were misappropriated and disclosed by Shaiper, and used by Brentwood, constitute property of CCMI's estate pursuant to section 541 of the Bankruptcy Code. CCMI's contractual rights under the Non-Interference Agreement constitute property of the estate pursuant to section 541 of the Bankruptcy Code.

45.     Defendants willfully violated the automatic stay in effect pursuant to section 362 of the Bankruptcy Code through their actions in obtaining and maintaining possession of, exercising control over, and using and benefitting from the trade secrets, confidential, and proprietary information that is the property of CCMI's estates

46.     Defendants willfully violated the automatic stay in effect pursuant to section 362 of the Bankruptcy Code by failing to perform their own obligations to CCMI or by procuring the nonperformance of others' obligations to CCMI.

# COUNT II
## (TURNOVER OF PROPERTY OF THE ESTATE, 11 U.S.C. § 542)
### (Against Defendants)

47.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

48.     CCMI's trade secrets, confidential, and proprietary information, which were misappropriated and disclosed by Shaiper constitute property of CCMI's estate pursuant to

12

section 541 of the Bankruptcy Code. The trade secrets, confidential, and proprietary information are of substantial value, benefit and use to CCMI.

49. Defendants have possession, custody, and/or control of the trade secrets, confidential, and proprietary information.

50. Accordingly, Defendants must deliver to CCMI an account for the trade secrets, and confidential and proprietary information, or the value of the trade secrets, confidential, and proprietary information pursuant to section 542(a) of the Bankruptcy Code.

## COUNT III
## (BREACH OF CONTRACT)
### (Against Shaiper)

51. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

52. Shaiper knowingly and voluntarily agreed to enter into the Non-Interference Agreement with CCMI and to abide by its terms.

53. The Non-Interference Agreement is a valid and enforceable contract.

54. The restrictions in the Non-Interference Agreement are reasonable, do not impose an undue burden on Shaiper, and are not injurious to the public.

55. Upon information and belief, Shaiper has retained, used, misappropriated, and/or disclosed CCMI's trade secrets, confidential, and proprietary information in violation of the terms of the Non-Interference Agreement.

56. Upon information and belief, Shaiper has also solicited, and continues to solicit, CCMI employees to join Brentwood and has solicited, and continues to solicit, business from CCMI customers in violation of the terms of the Non-Interference Agreement.

13

57. Upon information and belief, Shaiper has made disparaging or defamatory comments regarding CCMI.

58. CCMI has suffered, and will continue to suffer, irreparable harm and injury as a result of Shaiper's breaches of the Non-Interference Agreement, including, but not limited to, financial injury; lost business opportunities and customers; misuse of trade secrets, confidential, and proprietary information; and destruction of good will.

59. CCMI has no adequate remedy at law. Such conduct will continue to cause irreparable harm unless restrained by the Court.

60. Pursuant to the terms of the Non-Interference Agreement, CCMI is entitled to apply for injunctive relief to restrain Shaiper from violating the Non-Interference Agreement, and seek all available damages for said breach.

## COUNT IV
### (TORTIOUS INTERFERENCE WITH CONTRACT)
### (Against Brentwood)

61. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

62. Brentwood knew or should have known that Shaiper had entered the Non-Interference Agreement with CCMI.

63. Brentwood has procured Shaiper's breach of the Non-Interference Agreement intentionally and without justification.

64. As a result of the fomentation of contractual breaches, CCMI suffered, and will continue to suffer, irreparable harm.

DOCS_DE:218423.1 69353/002

65.     To remedy this tortious interference, Brentwood must be enjoined from procuring or facilitating Shaiper's continued breach of her Non-Interference Agreement. Brentwood must also pay damages in an amount to be determined at trial.

## COUNT V
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT
### (Against Defendants)

66.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

67.     CCMI developed its trade secrets, including but not limited to, contract pricing terms and structure, customer lists, customers' contractual terms, customer preferences, market opportunities, employee salary information, and employee scope of duties, with substantial effort.

68.     This information constitutes trade secrets because it has independent economic value and is subject to CCMI's reasonable efforts to maintain their secrecy.

69.     CCMI has taken substantial steps to protect its trade secrets from disclosure outside of its business, and amongst its own employees when not absolutely necessary.

70.     Because of the nature of Shaiper's position while employed at CCMI, during the course of her employment, Shaiper had access to and was made privy to CCMI's trade secrets.

71.     Shaiper, without authority and through improper means, has or will inevitably misappropriate, misuse, and disclose CCMI's trade secrets and its confidential and proprietary information. By working for Brentwood, Shaiper also threatens to continue to misappropriate CCMI's trade secrets by using them while employed by Brentwood and/or

DOCS_DE:218423.1 69353/002

disclosing them to Brentwood, despite her statutory and contractual duties to maintain their confidentiality.

72.     Upon information and belief, Brentwood misappropriated CCMI's trade secrets and confidential and proprietary information when it acquired and/or used information it obtained from or was given by Shaiper.

73.     The misappropriation of trade secrets by Defendants has and/or will cause substantial damage to CCMI including, but not limited to, financial injury; lost business opportunities and customers; misuse of trade secrets, confidential, and proprietary information; and destruction of good will.

74.     The Missouri Uniform Trade Secrets Act provides that "actual or threatened misappropriation may be enjoined." Mo. Stat. § 417.455(1).

75.     The threat of further imminent irreparable injury to CCMI outweighs the threatened harm of the proposed injunctive relief against Defendants.

76.     Any injunctive relief, if issued, will not disserve the public interest.

77.     CCMI will be irreparably harmed without the injunctive relief requested because of Defendants' misappropriation and threatened misappropriation of CCMI's trade secrets, and CCMI does not have an adequate remedy at law.

78.     Because Defendants willfully and maliciously misappropriated CCMI's trade secrets, CCMI is entitled to an award of reasonable attorney's fees and exemplary damages.

## COUNT VI
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT
### (Against Defendants)

79.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

16

80. CCMI developed its trade secrets, including but not limited to, contract pricing terms and structure, customer lists, customers' contractual terms, customer preferences, market opportunities, employee salary information, and employee scope of duties, with substantial effort.

81. This information constitutes trade secrets because it has independent economic value and is subject to CCMI's reasonable efforts to maintain their secrecy.

82. CCMI has taken substantial steps to protect its trade secrets from disclosure outside of its business, and amongst its own employees when not absolutely necessary.

83. Because of the nature of Shaiper's position while employed at CCMI, during the course of her employment, Shaiper had access to and was made privy to CCMI's trade secrets.

84. Shaiper, without authority and through improper means, has or will inevitably misappropriate, misuse, and disclose CCMI's trade secrets and its confidential and proprietary information. By working for Brentwood, Shaiper also threatens to continue to misappropriate CCMI's trade secrets by using them while employed by Brentwood and/or disclosing them to Brentwood, despite her statutory and contractual duties to maintain their confidentiality.

85. Upon information and belief, Brentwood misappropriated CCMI's trade secrets and confidential and proprietary information when it acquired and/or used information it obtained from or was given by Shaiper.

86. The misappropriation of trade secrets by Defendants has and/or will cause substantial damage to CCMI including, but not limited to, financial injury; lost business

17

opportunities and customers; misuse of trade secrets, confidential, and proprietary information; and destruction of good will.

87.    The Florida Uniform Trade Secrets Act provides that "actual or threatened misappropriation may be enjoined." Fl. Stat. § 688.003.

88.    The threat of further imminent irreparable injury to CCMI outweighs the threatened harm of the proposed injunctive relief against Defendants.

89.    Any injunctive relief, if issued, will not disserve the public interest.

90.    CCMI will be irreparably harmed without the injunctive relief requested because of Defendants' misappropriation and threatened misappropriation of CCMI's trade secrets, and CCMI does not have an adequate remedy at law.

91.    Because Defendants willfully and maliciously misappropriated CCMI's trade secrets, CCMI is entitled to an award of reasonable attorney's fees and exemplary damages.

## COUNT VII
### (BREACH OF DUTY OF LOYALTY)
### (Against Shaiper)

92.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

93.    During her employment with CCMI or its predecessors, Shaiper was a trusted and highly compensated employee and owed a duty of loyalty to CCMI to act in the best interests of CCMI.

94.    Shaiper knowingly, intentionally, and purposefully lured CCMI's customers and employees away, and improperly used and/or disclosed CCMI's trade secret, confidential, and proprietary information, up to the date of her resignation and thereafter.

95.    Shaiper's actions violated her duty of loyalty to CCMI.

18

96.     As a result, Shaiper was a faithless servant, and must disgorge her ill-gotten gains, and CCMI is entitled to recover all sums paid to Shaiper as compensation during the period that she was disloyal.

## COUNT VIII
## (AIDING AND ABETTING BREACH OF DUTY OF LOYALTY)
### (Against Brentwood)

97.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

98.     Brentwood had actual knowledge that Shaiper was a high-level employee of CCMI when it solicited her for employment.

99.     Because Brentwood knew that Shaiper was a CCMI employee and Chief Operations Officer, Brentwood knew or should have known that Shaiper owed CCMI a fiduciary duty of loyalty.

100.    Upon information and belief, despite its knowledge of the fiduciary duty Shaiper owed to CCMI, Brentwood encouraged Shaiper to breach that duty by asking Shaiper to obtain CCMI's confidential information and trade secrets in order to give Brentwood an unfair competitive advantage over CCMI, and assist Brentwood in raiding CCMI's employees, who CCMI had invested considerable resources in by providing them with extensive training.

101.    Upon information and belief, Brentwood also substantially assisted Shaiper in breaching her fiduciary duty to CCMI by providing her with economic and other support that enabled her to interfere with CCMI's customer relationships, obtain CCMI's confidential information and trade secrets, and raid CCMI's employees.

102.    Brentwood affirmatively decided to participate in Shaiper's breach of her fiduciary duty to CCMI.  As a result of aiding and abetting Shaiper in breaching her fiduciary

19

duty of loyalty to CCMI, Brentwood proximately caused monetary damages and irreparable harm to CCMI.

<u>COUNT IX</u>
**(TORTIOUS INTERFERENCE WITH CCMI'S BUSINESS RELATIONS)**
**(Against Defendants)**

103.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

104.    CCMI had and has a legitimate business relationship with each of its customers, as discussed above. Many of these customers had long standing business relationships with CCMI.

105.    Defendants had knowledge of CCMI's existing and prospective business relationships with its customers.

106.    Defendants intentionally and tortiously interfered with and sought to terminate CCMI'S business relationships with its customers. Defendants acted improperly, willfully and with malice, enjoyed no privilege and were not justified in their interference with CCMI's business relationships with its customers.

107.    Defendants' intentional and tortious conduct has caused some of CCMI's customers to cease business relations with CCMI and to immediately thereafter begin business relations with Brentwood.

108.    As a direct result of Defendants' tortious interference with CCMI's business relations, CCMI has suffered and will continue to suffer damages resulting from the loss of its business opportunities and contracts, deterioration of competitive position, and the loss and destruction of its customer relationships and goodwill.

DOCS_DE:218423.1 69353/002

## COUNT X
## (CIVIL CONSPIRACY)
### (Against Defendants)

109.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

110.    Defendants maliciously acted in concert and pursuant to a common design and scheme to pursue an unlawful object or course of action to be accomplished by unlawful means, with the purpose of competing against CCMI and misappropriating CCMI's trade secrets, confidential, and proprietary information, to the detriment of CCMI.

111.    Defendants committed acts in furtherance of the conspiracy, including, but not limited to, breach of contract, tortious interference with contract, misappropriation of trade secrets, and breach of the duty of loyalty, without a reasonable or lawful excuse. Both Defendants were willful participants in this joint activity.

112.    As a direct and proximate result of these unlawful acts, CCMI has suffered damages as a result of Defendants' actions.

## COUNT XI
## (UNFAIR COMPETITION)
### (Against Defendants)

113.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

114.    Defendants' conduct and actions, and the inevitable disclosure of confidential and proprietary information, as described above, constitute unfair competition in violation of the common law.

DOCS_DE:218423.1 69353/002

115.     Defendants have caused harm to the commercial relationships between CCMI and its customers and former employees by engaging in actionable unfair business and trade practices.

116.     Defendants' unfair competition has damaged CCMI or will cause damage to CCMI, which has suffered, and will continue to suffer, irreparable harm that justifies enjoining Defendants' from their illegal and improper actions, along with all other remedies available to CCMI.  CCMI has also suffered or will suffer monetary damages.

**COUNT XII**
**(UNJUST ENRICHMENT)**
**(Against Defendants)**

117.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

118.     By reason of the foregoing acts, CCMI has been impoverished and has been deprived of its rightful property and earnings.  Defendants have unjustly retained a benefit to CCMI'S detriment, and have been enriched without justification and at CCMI'S expense by committing the aforesaid tortious acts.

119.     Defendants' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiff hereby respectfully requests that this Court enter judgment in favor of the Plaintiff and an order:

a.     Declaring that the Non-Interference Agreement is valid and enforceable, and that Shaiper must abide by all of the terms.

b.     Declaring that Shaiper's unauthorized conduct violates CCMI's rights under the Non-Interference Agreement.

22

c.  Enjoining Defendants from using and/or disclosing, directly or indirectly, CCMI's trade secrets; using and/or disclosing, directly or indirectly, CCMI's confidential and proprietary information; contacting any customer or employee of CCMI's; and tortiously interfering with CCMI's ongoing contractual or business relationships.

d.  Declaring that Shaiper was a faithless servant in violation of her duty of loyalty prior to her resignation from CCMI.

e.  Declaring that Defendants have willfully violated the automatic stay in effect pursuant to 11 U.S.C. § 362.

f.  Enjoining Defendants from violating the automatic stay in effect pursuant to 11 U.S.C. § 362.

g.  Compelling Defendants to turn over CCMI's trade secrets, confidential, and proprietary information, and any other property of CCMI's estate taken by any means by Shaiper, or received by any means by Brentwood, and to certify their compliance with the Court's order.

h.  Awarding actual and punitive damages, including costs and attorneys' fees, to CCMI for such violations arising from the foregoing acts of breach of contract, misappropriation of trade secrets, breach of duty of loyalty, tortious interference with contract, and violation of the automatic stay, plus interest as appropriate.

i.  Granting such other and further relief, as provided for by contract, statute and law, or as this Court deems just or proper.

DOCS_DE:218423.1 69353/002

Dated: March 13, 2018
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       joneill@pszjlaw.com
       pkeane@pszjlaw.com

   -and-

Kathryn A. Coleman
Christopher Gartman
Erin E. Diers
Jacob Gartman
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
Email: katie.coleman@hugheshubbard.com
       chris.gartman@hugheshubbard.com
       erin.diers@hugheshubbard.com
       jacob.gartman@hugheshubbard.com

*Counsel for the Debtors*

24