## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT NATIONAL INC., *et al.*, | ) | Case No. 18-10189 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| CORPORATE CLAIMS MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 18-50307 (KG) |
| | ) | |
| MICHELLE SHAIPER AND BRENTWOOD SERVICES ADMINISTRATORS, INC., | ) | |
| | ) | |
| Defendants. | ) | **Re: D.I. Nos. 22, 24** |

## OPINION

Corporate Claims Management, Inc. ("CCMI" or the "Company") brings this adversary proceeding against Michelle Shaiper ("Shaiper") and Brentwood Services Administrators, Inc. ("Brentwood") (collectively with Shaiper, the "Defendants"). In a thirteen count complaint (the "Complaint"), CCMI alleges that through use of the Company's trade secrets, confidential and proprietary information (collectively, the "Misappropriated Information"), Defendants stole customers and employees under a pre-meditated course of action involving Shaiper leaving CCMI to join Brentwood. CCMI states that such actions led to a breach of Shaiper's contracts with the Company, a misappropriation of trade secrets and several other tortious actions.

Defendants moved to dismiss the Complaint.  They filed separate motions for judgment on the pleadings (the "Motion" or "Motions") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7012.

### Facts[1]

CCMI provides the risk management community with custom-tailored, high-quality claims administrative services and risk management information systems designed to the unique specifications of each customer. Compl. ¶ 10.  Brentwood is also a provider of insurance-related services and is in a field similar to CCMI. Compl. ¶ 35.  CCMI places an emphasis as a company on its relationships with its customers and its dedication to, and development of, its employees. *See* Compl. ¶¶ 12-14.  Shaiper worked for CCMI from April 1996 to December 2017, acting as Chief Operations Officer (COO) prior to her departure from the Company. Compl. ¶¶ 15, 17.  Due to her position as COO, Shaiper had unique access to detailed information regarding CCMI's customer base and employees. Compl. ¶¶ 19-20.

In April 2015, Patriot National, Inc. ("Patriot" or the "Debtor") acquired CCMI. Compl. ¶ 11.  As part of the acquisition, Shaiper executed an Employment Agreement (the "Employment Agreement") and a Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Non-Interference Agreement"). Compl. ¶ 16.  In the Non-Interference Agreement, Shaiper acknowledged that through her position as COO she

---

[1] On a motion for judgment on the pleadings, the well-pleaded allegations will be deemed to be true and construed favorably to the non-moving party.  However, unsupported conclusory statements are not accepted. *See*, *e.g.*, *Dicarlo v. St. Mary Hosp.*, 530 F.3d 255, 262-63 (3d Cir. 2008).

would acquire confidential information, which could include trade secrets, and she agreed not to engage in any interfering activities during her employment.[2] Compl. ¶¶ 23-25.

More than three years later, on December 12, 2017, Shaiper received an employment offer from Brentwood. Comp. ¶ 32.  After receiving the offer, and while still employed at CCMI, Shaiper held a meeting (the "Meeting") with several CCMI employees to discuss her future plans. *Id.*  At that meeting, Shaiper allegedly stated the following:

> [J]ust know that there is a bigger plan, and I would like to see everybody part of that plan. I'm not going to say too much more about what the plan is, but you're all in our plan…[t]here are people that are going to be here to continue to service our accounts until we figure out where we are all going to land together.
> …
> We have to try to keep our clients the best that we can, so we have to have some people that are going to move forward and try to retain those clients, maybe somewhere else, and people that stay here for a while and keep things alive and going until we can all be together as a team again.  It just has to be somewhere else.
> …
> The idea is to get everybody to move over to where we're going, I don't know if that's [going to] happen, but I would say, get your resumes together because it'd be stupid not to.

---

[2] The Non-Interference Agreement defined "Interfering Activities" to include such items as encouraging current employees to terminate their employment with CCMI or encouraging any customers to cease to do business with CCMI.

Compl. ¶ 33.  Shortly after the Meeting, Shaiper tendered her resignation. Compl. ¶ 34. CCMI ultimately terminated Shaiper for cause on December 29, 2017,[3] and she began work at Brentwood in January 2018.[4] *Id.*

Since Shaiper's departure, Brentwood has allegedly solicited and hired thirty CCMI employees, representing more than half of CCMI's workforce. Compl. ¶ 37. Employees have continued to leave CCMI for Brentwood, taking CCMI customer information with them, as recently as March 15, 2018. Compl. ¶ 42.  Brentwood has also allegedly acquired fifteen CCMI customers, representing an aggregate annual revenue of approximately $3.4 million, nearly half of CCMI's annual revenue. Compl. ¶ 40.

On January 30, 2018, CCMI, along with the Debtor, filed a Chapter 11 petition (the "Petition"). *See In re Patriot National Inc.*, No. 18-10189 (KG) D.I. 1 (Bankr. D. Del. Jan. 30, 2018).  CCMI initiated this adversary proceeding by filing the Complaint on March 23, 2018. *See CCMI v. Shaiper*, No. 18-50307 (KG), D.I. 1 (Bankr. D. Del. March 23, 2018).

## <u>Jurisdiction</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b) arising under the Bankruptcy Code.

---

[3] CCMI allegedly fired Shaiper for violating the Non-Interference Agreement. Compl. ¶ 34.

[4] CCMI states that prior to working for Brentwood, and while still employed by CCMI, Shaiper created a spreadsheet listing of all CCMI's customers and their contracts. Compl. ¶ 39. The Complaint does not, however, affix a date to the creation of spreadsheet or suggest a timeframe relative to the meeting held by Shaiper, or her resignation date.

### Legal Standard

While Defendants seek judgment on the pleadings pursuant to Federal Rule of Civil Procedure Rule 12(c), the Court will analyze the Motions under Federal Rule of Civil Procedure 12(b)(6), made applicable by Bankruptcy Rule 7012(b). *See In re Fedders*, 422 B.R. 5, 9-10 (Bankr. D. Del. 2010) ("The standard for a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion."). Rule 12(b)(6) provides for dismissal if a complaint fails to state a claim upon which relief can be granted, and is associated with Federal Rule of Civil Procedure 8(a)(2), made applicable by Bankruptcy Rule 7008, which states that a complaint fails unless it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 285 (1986)). The *Twombly* standard is one of plausibility and not probability "[and] simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556. In analyzing a complaint, the court will determine if a plaintiff has "nudged [their] claims across the line from conceivable to plausible." *Id.* at 570.

The Supreme Court further addressed the Rule 8(a)(2) pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). Under *Iqbal*, the Supreme Court affirmed that the *Twombly* standard applies to all civil suits in federal courts and

further identified that "a court must accept as true all of the allegations contained in the complaint," and "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678. The Third Circuit in applying the *Iqbal* standard stated a two-part test:

> First, the factual and legal elements of a claim should be separated. The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a [court] must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d. Cir. 2009). With these principles in mind, the Court will proceed with its analysis of the Motion.

<u>**Discussion**</u>

The Complaint raises three separate categories of claims: (1) claims grounded in bankruptcy law; (2) claims grounded in trade secret law; and (3) claims grounded in state tort law. The Court will address each category of claim in turn.

**I.     Bankruptcy Claims**

**A.  Count One – Violation of the Automatic Stay**

Section 362(a)(3) of the Bankruptcy Code provides that "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" constitutes a willful violation of the automatic stay. "A violation of [Section] 362(a)(3)…requires both (1) a post-petition act and (2) property of the estate." *Pardo v. Nylcare Health Plans, Inc. (In re APF Co.)*, 274 B.R. 408, 416 (Bankr. D. Del. 2001). Should a violation occur, Section 362(k)(1) subjects violators to liability for

"actual damages, including costs and attorneys' fees, and, in appropriate circumstances … punitive damages."

CCMI alleges that Defendants violated the automatic stay by obtaining, maintaining and continually using CCMI's Misappropriated Information. CCMI states that the Misappropriated Information constitutes property of the estate and Defendants have continued to use the Misappropriated Information to their benefit despite the invocation of the automatic stay on the bankruptcy filing date of January 30, 2018. The Court finds the Complaint sufficiently alleges claims under Section 362(a)(3) and (k).

The Complaint states in pertinent part that since leaving CCMI for Brentwood, "Shaiper *continues* to use [the Misappropriated Information] at Brentwood in direct violation of the Non-Interference Agreement." Compl. ¶ 39 (emphasis added). The Complaint similarly adds that "Defendants willfully violated, and *continue to violate*, the automatic stay…through their actions in obtaining and maintaining possession of, exercising control over, and using and benefitting from the [Misappropriated Information] that is the property of CCMI's estate." Compl. ¶ 46 (emphasis added). Both statements emphasize continuous use and contain enough factual allegations to establish a plausible claim for relief.[5]

Defendants argue that CCMI's claims should be dismissed because the Complaint does not allege a post-petition affirmative act, but rather a passive act of holding on to, and failing to remit, the Misappropriated Information. The Court does not agree.

---

[5] The word "continuous" also indicates that Defendants are actively using the Misappropriated Information, not merely passively possessing it as Defendants argue.

At this stage of the proceedings, CCMI is only obliged to provide allegations that are not conclusory or a recitation of the elements. *Twombly*, 550 U.S. at 555. Furthermore, when ruling on a motion to dismiss, "courts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words, but, rather, upon the presence of a factual situation which is or is not justiciable." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3d Cir. 1998). Viewing the Complaint as a whole, CCMI has alleged that both Shaiper and Defendants have used the Misappropriated Information post-petition. As discussed above, paragraphs 39 and 46 specifically use the word "continuous." Moreover, the Complaint states that Shaiper laid out a long-term exit plan for CCMI employees at the Meeting, and CCMI employees continued to leave the Company for Brentwood post-petition. These facts, in connection with CCMI's continuous use allegations, properly allege an automatic stay violation.

Defendants further argue that even if CCMI establishes that they performed any post-petition acts, the Misappropriated Information and violation of the Non-Interference Agreement are not property of the estate. First, in relation to Shaiper's contract rights under the Non-Interference Agreement, "[c]ourts *have* held…that property of the estate includes contract rights." *EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 639 (Bankr. D. Del. 2006) (emphasis added). Sections 1(a), 5(d) and 10(e) of the Non-Interference Agreement specifically state that CCMI's contract rights with Shaiper survive the termination of her employment. *See* Compl. ¶ 24. Ultimately, Shaiper's contractual rights survived her termination date and the Petition Date, permitting them possibly to be property of the estate.

Second, in relation to the Misappropriated Information, Section 541 of the Bankruptcy Code states that at the commencement of a chapter 11 case, "all legal or equitable interests of the debtor in property" become property of the estate. Proprietary and confidential information such as customer lists *have* been found to constitute property of the estate.[6] *See Cyganowski v. Biolitec U.S. Inc. (In re Biolitec)*, 2015 WL 351201, at *11 (Bankr. D.N.J. Jan. 23, 2015); *Phillips v. Diecast Mktg. Innovations, LLC (In re Collecting Concepts, Inc.)*, 2000 WL 1191026, at *3 (Bankr. E.D. Va. Feb. 28, 2000). Moreover, customer lists are often considered part of the estate as assets in a bankruptcy proceedings. *See, e.g.*, *In re Coda Holdings, Inc.*, 2013 WL 6840242, at *5-7 (Bankr. D. Del. May 3, 2013); *In re Exaeris, Inc.*, 380 B.R. 741, 743 (Bankr. D. Del. 2008); *In re U.S. Mineral Products Co.*, 2005 WL 5887218, at *5 (Bankr. D. Del. Nov. 29, 2005); *In re Panda Temple Power, LLC*, 2017 WL 5483330, at *10 (Bankr. D. Del. May 12, 2017). Similar to the cases cited above, CCMI includes customer lists, as well as other proprietary information, in its allegations against Defendants regarding the Misappropriated Information.

It is important to note that at this stage of the proceedings, the Court need not decide if the contract rights and Misappropriated Information are in fact property of the estate; the Court need only determine if CCMI has alleged facts that, with further evidence, *could reveal* the contract rights and Misappropriated Information as property of the estate. CCMI has met this burden and properly alleged Shaiper's contract rights and

---

[6] Both CCMI and Defendants discuss and raise arguments regarding CCMI's purported trade secrets constituting property of the estate. As the Misappropriated Information may be property of the estate regardless of CCMI's trade secret claims under federal or state law, the Court will not address such arguments here.

the Misappropriated Information constitute property of the estate which Defendants have used post-petition. For these reasons, the Motions as to Count One are denied.

## B. Count Two – Turnover of Property of the Estate

Pursuant to Section 542(a) of the Bankruptcy Code, "an entity…in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363…shall deliver to the trustee, and account for, such property or the value of such property…." To establish a turnover claim, the party seeking turnover has the burden to show that "(1) the property is in the possession, custody or control of another entity; (2) the property can be used in accordance with the provisions of [S]ection 363; and (3) the property has more than inconsequential value to the debtor's estate." *Zazzali v. Minert (In re DBSI)*, 468 B.R. 663, 669 (Bankr. D. Del. 2011) (quoting *Newman v. Tyberg (In re Steel Wheels Transport, LLC)*, 2011 WL 5900958, at *5 (Bankr. D.N.J. Oct. 28, 2011)).

CCMI alleges that the Misappropriated Information constitutes property of the estate, which Defendants possess and must turn over. The Court agrees, and finds that CCMI has appropriately alleged a turnover claim under Section 542.

Defendants argue that CCMI has not presented facts that support the claim that the Misappropriated Information provides consequential value to the Debtor's estate, and instead believe the Complaint merely recites the elements of a turnover claim. But CCMI clearly states in the Complaint that Defendants have stolen fifteen customers with an aggregate annual revenue of nearly $3.4 million. While Defendants feel the value of the Misappropriated Information solely relates to the cause of action (not the information

itself), CCMI is only required to propose *any* use, benefit or value the Misappropriated Information may have. *See DBSI*, 468 B.R. at 669 (emphasis in original). CCMI has proposed such a value in both the number of customers and the aggregate revenue number of $3.4 million.

Shaiper claims that CCMI is judicially estopped from asserting its turnover claim for failing to disclose any trade secrets on its bankruptcy schedules. To raise a judicial estoppel claim, a party must show that: (1) the two legal positions by the party are irreconcilably inconsistent; (2) the change in position was made in bad faith; and (3) the remedy of judicial estoppel is tailored to address the harm and no lesser sanction is adequate. *Yetter v. Wise Power Sys., Inc.*, 929 F. Supp. 2d 329, 331 (D. Del. 2013) (citing *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001).

Shaiper bases her claim on the fact that CCMI failed to disclose any of the trade secrets on its bankruptcy schedules, despite CCMI claiming in this adversary proceeding that the Misappropriated Information is of substantial value, use and benefit. CCMI responds that the Debtors' (of whom CCMI is a part) entire purpose in reorganization is the preservation of any going-concern value throughout the bankruptcy case.[7] The Court agrees and does not find facts sufficient for CCMI's actions to rise to a level of bad faith such that judicial estoppel is the proper remedy.

---

[7] Shaiper's reply brief contained no response to this argument or CCMI's argument in general that her judicial estoppel claim fell short of meeting the elements set forth in *Yetter*.

As the Court must accept all well-pled facts as true, CCMI's turnover claim properly alleges all three elements.  For these reasons, the Motions as to Count Two are denied.

## II.    Trade Secret Claims

CCMI raises three claims asserting misappropriation of trade secrets under three separate statues: the Missouri Uniform Trade Secrets Act (MUTSA), the Florida Uniform Trade Secrets Act (FUTSA) and the Federal Defend Trade Secrets Act (DTSA).[8]  Within each allegation, CCMI alleges that Defendants misappropriated seven different types of information held by CCMI which constitute trade secrets: (1) contract pricing terms and structure; (2) customer lists; (3) customers' contractual terms; (4) customer preferences; (5) market opportunities; (6) employee salary information; and (7) employee scope of duties. Compl. ¶ 85.  The Court will address each individually, beginning with CCMI's state law trade secret claims under the MUTSA and FUTSA before addressing the federal

---

[8] Shaiper's Non-Interference Agreement provides that any disputes arising from the agreement shall be governed by Florida law, permitting CCMI to bring claims against Shaiper under the Florida law.  The remaining claims, however, are governed by Missouri law under the "most significant relationship test," which provides the Court with a framework to analyze choice of law issues. *See Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings)*, 553 B.R. 235, 245 (Bankr. D. Del. 2016) (finding that Delaware courts apply the most significant relationship test).  Section 145 of the Restatement (Second) [of Conflicts] instructs the court to examine four types of contacts: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* In the case at hand, CCMI's principal place of business lies in Missouri, CCMI alleges to have suffered injuries in Missouri, Shaiper is a resident and citizen of Missouri and a substantial portion of CCMI's claims entail Shaiper's actions during her employment with CCMI.  The Court finds that based upon these facts, Missouri has the most significant relationship to the Complaint and Missouri law governs all claims asserted against Brentwood.

claims under the DTSA.  Furthermore, for purposes of the MUTSA, the Court will separate the individual information claims into two separate groups, namely the customer list allegations (the "Customer List") and the remaining Misappropriated Information allegations (the "Non-Customer List Materials").

### A.  Count Six – Misappropriation of Trade Secrets Under the MUTSA

Under Missouri State law, a party seeking to assert a claim for misappropriation under the MUTSA must show three elements: "(1) a trade secret exists, (2) the defendant misappropriated the trade secret, and (3) the plaintiff is entitled to either damages or injunctive relief." *Cent. Trust and Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014) (en banc) (citing Mo. Ann. Stat. § 417.453(2)).  The Missouri Supreme Court looks to the Restatement of Torts when determining what constitutes a trade secret, and clarifies that "[a] trade secret is a process or device for continuous use in the operation of the business...relat[ing] to the production of goods" but may also include "code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management." *See Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 18-19 (Mo. 1966) (en banc) (quoting Restatement of Torts § 757 (1934)).  Trade secrets "differ[] from other secret information in a business in that [they are] not simply information as to single or ephemeral events in the conduct of the business." *Id.* (internal citations omitted).

13

### 1. Customer List Allegations

CCMI alleges that under the MUTSA, Defendants inappropriately acquired the Customer List, and used it to steal fifteen customers with an aggregate annual revenue of nearly $3.4 million.  Under Missouri law, the Court does not find the Customer List to constitute a trade secret.

While customer lists under Missouri law are protectable under proper means of protection such as a non-competition agreement, "they are not protectable under a theory of confidential relationship or trade secret."[9] *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 18 (Mo. 2012) (en banc) (quoting *Walter E. Zemitzsch, Inc. v. Harrison*, 712 S.W.2d 418, 422 (Mo. Ct. App. 1986)).

CCMI attempts to persuade the Court that *Western Blue* is no longer good law, and instead directs the court to an Eastern District of Missouri case decided in July 2017. *See Express Scripts, Inc. v. Lavin*, 2017 WL 2903205 (E.D. Mo. July 7, 2017).  In *Express Scripts*, the district court, applying Missouri law, found that certain confidential contract and customer information, such as a list including the identity of current and potential customers, fell within the definition of a trade secret. *Id.* at *6.  However, "[a] federal court is bound to follow state law announced by the state's highest court." *Chorman v. Foamex Int'l, Inc. (In re Foamex Int'l Inc.)*, 491 B.R. 100, 106 (Bankr. D. Del. 2013) (citing *Mosley v. Wilson*, 102 F.3d 85, 92 (3d Cir. 1996)).  In analyzing differing opinions between federal and state courts, a bankruptcy judge is obliged "in every case to ascertain from all the

---

[9] *Western Blue* removes customer lists from Missouri's definition of a trade secret initially provided in the *Nat'l Rejectors* case.

available data what the state law is and apply it rather than to prescribe to a different rule, however superior it may appear…and however much the state rule may have departed from prior decisions of the federal courts." *In re Dembrosky*, 245 B.R. 345, 247-48 (Bankr. W.D.N.Y. 1999), *rev'd sub nom. Chrysler Fin. Co., L.L.C. v. Schlant*, 243 B.R. 613 (W.D.N.Y. 2000)).   While the district court may have ruled contrary to the holding in *Western Blue*, the Court is required to follow Missouri's highest court,[10] and finds that customer lists do not constitute trade secrets under the MUTSA.

### 2.   The Non-Customer List Materials

For the Non-Customer List Materials,[11] CCMI similarly alleges that these categories of information qualify as trade secrets, which Defendants misappropriated upon Shaiper's arrival at Brentwood.   Here, CCMI has alleged sufficient facts to permit the claims involving these items of information to survive the Motion.

The definition section of the MUTSA states a trade secret is information that"[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons…and [i]s the subject of efforts that are reasonable…to maintain its secrecy." Mo. Ann. Stat. § 417.453(4)(a)-(b).   Several factors may be considered when determining if information is, in fact, a trade secret:

---

[10] It should be noted that the *Express Scripts* case does not cite, even in a cursory manner, the *Western Blue* case.

[11] The Non-Customer List Materials contain: (1) contract pricing terms and structure; (2) customers' contractual terms; (3) customer preferences; (4) market opportunities; (5) employee salary information; and (6) employee scope of duties.

> (1)The extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken [] to guard the secrecy of the information; (4) the value of the information to [the company and its] competitors; (5) the amount of effort or money expended by [the company] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006) (en banc).

In the Complaint, CCMI states it gave Shaiper, *as a result of her trusted position as COO*, access to the Non-Customer List Materials. The factual allegation that Shaiper had access based upon her status as an executive at the Company is enough, at this early stage in the case, to suggest the Non-Customer List Materials were not readily ascertainable by a non-executive employee or other individuals outside the Company. CCMI showed they valued the information accessible to executives by requiring Shaiper to sign the Non-Interference Agreement, which laid out in writing that she would be privy to certain confidential information and required to hold that information in confidence. Furthermore, Defendants alleged use of the Non-Customer List Materials indicates that competitors valued the information.

Assuming these well-pled facts as true, CCMI has alleged that the Non-Customer List Materials may rise to the level of a trade secret under the MUTSA. For these reasons, the Motions as to Count Six are granted in part and denied in part.

## B. Count Seven – Misappropriation of Trade Secrets Under the FUTSA

Under Florida law, a party claiming misappropriation of trade secrets must allege facts demonstrating:

> "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it; and (3) the secret [d]erives independent economic value from not being generally known or ascertainable through proper means."

*ABB Turbo Sys. AG v. TurboUSA, Inc.*, 774 F.3d 979, 985 (Fed. Cir. 2014) (alteration in original) (internal citations and quotation marks omitted); *see also* Fla. Stat. § 688.002(2). Unlike the MUTSA, the FUTSA includes customer lists in the definition of trade secrets, and therefore the Misappropriated Information will be analyzed as a whole. *See Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*, 216 F.R.D. 533, 536 (M.D. Fla. 2003) ("Florida courts have held that the term 'trade secrets' includes active customer lists.") (internal citations omitted); *Vas Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) (collecting cases) ("Florida courts have held that active customer and pricing lists constitute trade secrets."). With customer lists constituting trade secrets, the Court finds that CCMI has properly alleged a claim under the FUTSA, but to Shaiper only.

The only connection to Florida law in this case is the Non-Interference Agreement signed by Shaiper while at CCMI, which states that Florida law will govern any disputes relating to that agreement. Brentwood was not a party to that contract. Since Brentwood has no connection to the Non-Interference Agreement, any claims against Brentwood based upon the Non-Interference Agreement are dismissed.

17

Shaiper's argument under the FUTSA is substantially similar to her argument under the MUTSA, that the Misappropriated Information does not rise to the level of a trade secret.  As with the Court's finding in the MUTSA claim, the Complaint does allege that CCMI took steps to protect the Misappropriated Information by only permitting access to executives.

Shaiper argues that CCMI must show "evidence that a customer list was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for a unique business" to bring its FUTSA claim. *Zodiac Records Inc. v. Choice Evntl. Servs.* 112 So.3d 587, 590 (Fla. Dist. Ct. App. 2013) (internal quotations and citations omitted).  However, the case cited by Shaiper, as well as the case cited by the *Zodiac Records* court in support of its ruling, *see East v. Aqua Gaming, Inc.*, 805 So.2d 932, 933-34 (Fla. Dist. Ct. App. 2001), involve review of an order granting a temporary injunction.  The standard of review in an order to grant a temporary injunction is abuse of discretion, and the party seeking the injunction must show, along with other factors, a substantial likelihood of success on the merits. *Zodiac*, 112 So.2d at 590; *Aqua Gaming*, 805 So.2d at 934.  Under the *Twombly* standard, CCMI need only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the Misappropriated Information constituting a trade secret. *Twombly*, 550 U.S. at 556.  The Complaint satisfies the required pleading standard under *Twombly*, and Shaiper's motion to dismiss the FUTSA claim is denied.  For these reasons, the Motions as to Count Seven are granted in part and denied in part.

### C.  Count Three - Misappropriation of Trade Secrets Under the DTSA

"It is well-accepted that the DTSA[12] is in general comport with state trade secret law." *Alfasigma USA, Inc. v. EBM Med., LLC*, 2018 WL 1604961, at *2 (E.D. La. Apr. 3, 2018) (*comparing* 18 U.S.C. §§ 1836, 1839, with Uniform Trade Secrets Act § 1).  While the DTSA largely conforms with state trade secret laws, the House and the Senate committees "[did] not intend[] to alter the balance of current trade secret law or alter specific court decisions" on misappropriation. *Source Prod. & Equip. Co., Inc. v. Schehr*, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017) (citing H. Rep. No. 114-529, at 14 (2016); S. Rep. No. 114-220, at 10 (2016)).  "Thus, existing state law on trade secrets informs the Court's application of the DTSA." *Id.*

CCMI brings the claims it alleges under the MUTSA and the FUTSA under the DTSA as well.  As the DTSA is to conform with state trade secret laws and not alter specific court decisions, the Court will mirror its rulings under the MUTSA and the FUTSA.  Therefore, the claims against Brentwood survive the motion for the Non-Customer List Materials (as they did under the MUTSA); and the claims against Shaiper survive the motion in their entirety (as they did under the FUTSA).  For these reasons, the Motions as to Count Three are granted in part and denied in part.

### III.    State Law Claims

The remaining allegations (Counts Four, Five, Seven, Nine, Ten, Eleven, Twelve and Thirteen) entail state law claims raised against Defendants, with certain counts raised

---

[12] 18 U.S.C. § 1839 *et. seq.*

exclusively against Shaiper or Brentwood.  The parties agree that in evaluating the remaining state law claims, Florida law will govern Count Four (breach of contract, against Shaiper only), and Missouri law will govern the remaining counts.

### A.  Count Four – Breach of Contract

"To sustain an action for breach of contract under Florida law, a plaintiff must establish the follow elements: '(1) a valid contract; (2) a material breach, and (3) damages.'" *De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 113 F. Supp. 3d 1221, 1223 (M.D. Fla. 2014) (quoting *Havens v. Coast Florida, P.A.*, 117 So.3d 1179, 1181 (Fla. Dist. Ct. App. 2013)).

CCMI states that it properly alleges Shaiper materially breached the Non-Interference Agreement by retaining and using the Misappropriated Information during her employment at CCMI.  The Court concurs.

The parties agree that the Non-Interference Agreement is a binding, valid contract. CCMI alleges that while still employed at CCMI Shaiper engaged in "interfering activities" such as holding the Meeting with other CCMI employees, misappropriating confidential information by creating a spreadsheet of all of CCMI's customers and making disparaging remarks about the Company.  Each of these facts individually, under the Non-Interference Agreement, would constitute a material breach if found to have occurred as the Complaint states.  From these material breaches, CCMI alleges that the Company suffered damages of, at a minimum, $3.4 million based on its loss of annual revenue.

Shaiper argues that CCMI has not stated with specificity the confidential and proprietary information she allegedly misappropriated.    However, CCMI is only required at this stage in the proceeding to provide a "plain statement in order to 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" *Lima v. Bank of Am., N.A.*, 249 F. Supp. 3d 1308, 1312 (S.D. Fla. 2017) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (overruled on other grounds by *Twombly*, 550 U.S. 544)).    The Complaint refers to the information Shaiper placed on a spreadsheet regarding CCMI's customers, information that falls under the definition of "Confidential Information" in the Non-Interference Agreement, assuming the facts pled as true.    Furthermore, Shaiper allegedly solicited the employees during the Meeting and created a spreadsheet of customers while still employed at CCMI.    The Court finds that CCMI has alleged enough information to put Shaiper on notice of the information she misappropriated and the actions she took to constitute a breach of contract.    For these reasons, the Motion to dismiss Count Four is denied.

### B.  Count Five – Tortious Interference

Tortious interference with contract claims brought under Missouri law require proof of: "(1) a contract or valid businesses expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017) (en banc) (internal citations omitted).

CCMI alleges that Brentwood tortiously interfered with the Non-Interference Agreement between Shaiper and CCMI resulting in irreparable harm. The Court finds CCMI has not adequately alleged that Brentwood had knowledge of the contract.

"A claim that asserts mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Robinson v. Family Dollar Inc.*, 679 Fed. Appx. 126, 131 (3d Cir. 2017) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In support of its argument that Brentwood tortiously interfered with the Non-Interference Agreement, CCMI directs the Court to Paragraph 80 of the Complaint, which states "Brentwood knew or should have known that Shaiper had entered the Non-Interference Agreement with CCMI." This statement is no more than a recitation of the second element of knowledge required under Missouri law to put forth a tortious interference with contract claim. The Complaint contains no other facts indicating that Brentwood had, or should have had, knowledge of the Non-Interference Agreement.

CCMI posits that Brentwood should have known because a clause in the Non-Interference Agreement states that Shaiper must disclose the existence of the agreement to any prospective employees. But nowhere in the Complaint does CCMI state facts which indicate Brentwood and Shaiper had specifically discussed the Non-Interference Agreement with CCMI.[13] While the Court is required to view the Complaint as a whole

---

[13] CCMI attempts on one side to state that Shaiper breached a plethora of clauses in the Non-Interference Agreement revolving around confidential information, but on the other side

and not base its rulings on the mere presence of words, the Court is only permitted to assume well-pled facts as true, not assume entire factual scenarios. *See West Penn Power*, 147 F.3d at 263.  As CCMI has not adequately alleged Brentwood's knowledge of the Non-Interference Agreement between Shaiper and CCMI, the claim cannot proceed.  For these reasons, the Motion as to Count Five is granted.

### C.  Count Eight - Breach of the Duty of Loyalty

When asserting breach of fiduciary duty as a tort claim under Missouri law, the proponent must establish: (1) a fiduciary duty existed; (2) the defending party breached that duty; and (3) the breach caused the proponent to suffer harm. *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 381 (Mo. Ct. App. 2000).  When the alleged breach is founded upon a breach of the duty of loyalty for an employee acting in competition with his or her employer, Missouri law clarifies that "an employee may agree with others to compete upon termination of the employment and may plan and prepare for their competing enterprise while still employed" but the employee may not act contrary to the employer's interest or, while still employed, "go beyond mere planning and preparation and act in direct competition with the employer." *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 481 (Mo. 2005) (en banc) (citing Restatement (Second) of Agency § 393 (1958)).

---

argues that she clearly honored the clause that requires her to disclose the Non-Interference Agreement to any prospective employers.  The Court does not see any facts supporting CCMI's claims that Shaiper would neglect the former while honoring the latter.

CCMI asserts that Shaiper breached her fiduciary duty of loyalty by luring customers and employees away from CCMI up to, and after, her resignation with the Company.  The Court finds that CCMI has alleged sufficient facts to permit the claim to survive the Motion.

CCMI's fiduciary duty claim relies heavily on Shaiper's words and actions directed towards current CCMI employees during the Meeting.  At the Meeting, Shaiper allegedly stated that her plan was to try and "have some people that are going to move forward and try to retain those clients…and people that stay here for a while and keep things alive until we can all be together as a team again." Compl. ¶ 33.  At the Meeting, Shaiper also allegedly "made disparaging remarks about CCMI and its ability to continue in business." Compl. ¶ 34.  With the parties conceding that a fiduciary duty existed based upon Shaiper's status as an executive, the  alleged actions taken by Shaiper at the Meeting reveal an employee who is acting contrary to her employer's best interest by not only disparaging the Company, but soliciting to steal both its customers and employees.

Shaiper argues that the statement from the Meeting demonstrates only that Shaiper *planned* to engage in competition with CCMI, which under Missouri law is permitted.  But the Meeting indicates that Shaiper did more than merely plan and prepare for her departure.  Shaiper holding the Meeting to inform employees that she would be leaving and would be taking employees and customers in and of itself is an *act*.[14]

---

[14] The Meeting took employees away from their work activities, as well as directed the employees to take action themselves by asking them to "get [their] resumes ready" in preparation for leaving CCMI.

Furthermore, the bad mouthing of CCMI and its future business prospects to entice employees to leave is an act directly contrary to the Company's interests. Based upon Shaiper's alleged *actions*, CCMI has properly alleged a claim for breach of fiduciary duty. For these reasons, the Motion as to Count Eight is denied.

### D. Count Nine – Aiding and Abetting Breach of Fiduciary Duty

CCMI asserts that under Section 876 of the Restatement (Second) of Torts, Brentwood aided and abetted Shaiper's breach of the fiduciary duty she owed to the Company. Section 876 of the Restatement (Second) of Torts provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third parties.

At this time, the Missouri Supreme Court has yet to recognize a tort claim based upon Section 876 of the Restatement (Second) of Torts. *See Jo Ann Howard & Assoc., P.C. v. Cassity (Jo Ann I)*, 2012 WL 3984486, at *6 (E.D. Mo. Sept. 11, 2012) ("[T]he Missouri Supreme Court has not squarely decided whether to recognize the tort of aiding and abetting based on subsections (b) or (c) of § 876") (internal citations omitted). "When a state's highest court has not spoken on a subject, [the court] must attempt to predict how that tribunal would rule." *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996) (citing *Kowalsky v. Long Beach Twp.*, 72 F.3d 385, 387 (3d Cir. 1995)). In making such predictions, the rulings of the state's lower courts must be given deference

and should not be disregarded. *Id.* The Court predicts that the Missouri Supreme Court would not recognize a cause of action under Section 876 on the facts of this case.

CCMI suggests that under *Shelter Mut. Ins. Co. v. White*, the Missouri Supreme Court would recognize an aiding and abetting cause of action in tort; and that all cases to analyze this issue have followed the *Shelter Mutual* court's decision. 930 S.W.2d 1 (Mo. Ct. App. 1996). The Eighth Circuit Court of Appeals, however, recently found otherwise. *See Jo Ann Howard & Assoc., P.C. v. Cassity (Jo Ann II)*, 868 F.3d 637, 650 (8th Cir. 2017). The Eighth Circuit posited that *Shelter Mutual* erroneously based its finding on the Supreme Court of Missouri's decision in *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo. 1985) (en banc). *Jo Ann II*, 868 F.3d at 650. "The *Zafft* court first explained the concert-of-action theory derived from § 876(a) and then concluded that '[t]he element of agreement or cooperation necessary to application of this theory is lacking in this case.'" *Id.* at 650 (quoting *Zafft*, 676 S.W.2d at 245) (alteration in original). While the *Shelter Mutual* court found this language to mean the Missouri Supreme Court endorsed Section 876(a), *Shelter Mutual*, 930 S.W.2d at 3-4, the *Zafft* court later stated that "the theories advanced by plaintiffs do not persuade the Court to abandon the Missouri tort law which requires that they establish a causal relationship between the defendants and the injury-producing agent as a precondition to maintenance of their causes of action[,]" and rejected the plaintiffs concert-of-action claim. *Zafft*, 676 S.W.2d at 247. "*Zafft's* refusal to 'abandon the Missouri tort law' *could* be read as a rejection of [Section] 876(a)." *Jo Ann II*, 868 F.3d at 650 (emphasis added). At a minimum, seeing as the *Zafft* court rejected any concert-of-action claim, it did not need to accept or reject Section 876. *Id.* Therefore, *Shelter Mutual's*

reliance on *Zafft* was misplaced.  Seeing as the *Shelter Mutual's* analysis of aiding and

abetting was misguided, the Court affords its ruling little deference.

*Shelter Mutual* and *Zafft*, however, only address Section 876(a).  CCMI does cite to

other non-Missouri Supreme Court cases that do, without reservation, find that Missouri

law *would* recognize an aiding and abetting claim under Section 876(b) or (c). *See Lonergan*

*v. Bank of Am., N.A.*, 2013 WL 176024, at *11-12 (W.D. Mo. Jan. 16, 2013) (concluding that

Missouri does recognize liability for aiding and abetting tort); *Phelps v. Bross*, 73 S.W.3d

651, 656-57 (Mo. Ct. App. 2002) (recognizing the existence of aiding and abetting liability

under Missouri law in the commission of a battery); *Nickell v. Shanahan*, 2013 WL 2402852,

at *7 (Mo. Ct. App. June 4, 2013), *vacated, transferred, and rev'd on other grounds*, 439 S.W.3d

223 (Mo. 2014) (holding that a claim for aiding and abetting a breach of fiduciary duties

is a recognized cause of action under Missouri law).  Alternatively, Defendants respond

with several non-Missouri Supreme Court cases that find, without reservation, that

Missouri law *would not* recognize an aiding and abetting claim under Section 876(b) or

(c).[15] *See Omaha Indem. Co. v. Royal Am. Managers, Inc.*, 755 F. Supp. 1451, 1459 (W.D. Mo.

1991) (concluding that Missouri courts would not recognize a cause of action for aiding

and abetting a breach of fiduciary duty); *Blair v. City of Hannibal*, 179 F. Supp. 3d 901, 915

(E.D. Mo. 2016) (dismissing an aiding and abetting claim because the claim is not

---

[15] Brentwood cited also to *Bradley v. Ray*, 904 S.W.2d 302 (Mo. Ct. App. 1995) in support of
its argument for denial of any aiding and abetting claims in tort under Missouri law.  But, just as
in *Zafft*, the *Bradley* court discussed the issue of aiding and abetting but ultimately decided the
case on the plaintiff's inability to establish facts that could rise to a level of substantial assistance.
*Id.*  So despite stating that no Missouri cases recognize a claim for aiding and abetting, this acts
as mere dicta, and the case does not hold that the Missouri Supreme Court would accept or reject
claims under Section 876.

recognized in Missouri); *Jo Ann I*, 2012 WL 3984486, at *5 (indicating that the Missouri Supreme Court would not recognize an aiding and abetting claim).

With several courts acknowledging acceptance of Section 876 in regard to aiding and abetting, and others flatly rejecting it, the Court is left with "little guidance in an uncertain area." *Jo Ann II*, 868 F.3d at 651.   The Court is aware that it "may not significantly expand state law without a clear indication that the [Missouri] Supreme Court would do the same." *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993).   Consequently, as the Eighth Circuit did in *Jo Ann II*, the Court is not prepared to expand Missouri law to recognize an aiding and abetting claim under Section 876(a), (b) or (c) as a cause of action.  With no recognition of the theory, Brentwood cannot have aided and abetted Shaiper's breach of her fiduciary duty.   For these reasons, the Motion as to Count Nine is granted.

### E.  Count Ten – Tortious Interference with CCMI's Business Relations

Tortious interference with a business relationship under Missouri law requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages. *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 959 (8th Cir. 2007) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996) (en banc)).

CCMI alleges that Defendants, with knowledge, intentionally interfered with CCMI's business relationship with its current and prospective customers, such that CCMI

lost customers and suffered damages. The Court finds the facts pled by CCMI sufficient to allege such a claim against Shaiper, but not against Brentwood.

### 1. Brentwood

Brentwood argues that the tortious interference claim fails because it was permitted to engage in competitive conduct and the actions alleged in the Complaint were competitive in nature. *See Ameren Corp.*, 520 S.W.3d at 472 ("If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interest.") (citation omitted). "Improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or *any other wrongful act recognized by statute or common law.*" *Id.* (emphasis added). If the improper means allegations are based in use of a trade secret under the MUTSA, the claims "are preempted as derivative 'if they are based on facts related to the misappropriation of trade secrets claim." *EnviroPAK Corp. v. Zenfinity Capital, LLC*, 2015 WL 331807, at *5 (E.D. Mo. Jan. 23, 2015) (citation omitted). "For preemption to be triggered, the property that has been stolen/misappropriated must be a trade secret; otherwise, the [MUTSA] has no application." *Hallmark Cards, Inc. v. Monitor Clipper Partners*, 757 F. Supp. 2d 904, 917 (W.D. Mo. 2010). That is to say, the "MUTSA will not preempt a claim if the information at issue does not rise to the level of a statutorily defined trade secret." *EnviroPAK*, 2015 WL 331807, at *6 (citing *Hallmark Cards*, 757 F. Supp. 2d at 917).

As discussed above, the Court has already found that CCMI properly alleged a MUTSA claim for the Non-Customer List Materials.  Therefore, any claims of use of the Non-Customer List Materials are preempted by the MUTSA and cannot be brought against Brentwood simultaneously with any misappropriation of trade secret claims. *See id.* (finding that, to the extent a tortious interference claim relies on or is based on misappropriation claims, it is preempted by the MUTSA and must be dismissed).

That leaves only the Customer List as a potential basis for tortious interference. As the Customer List is not a protected interest, it is CCMI's burden to allege that Brentwood employed improper means in obtaining and/or using the Customer Lists. CCMI has failed to allege this.

CCMI alleges that Brentwood engaged in improper means by obtaining and using the Customer List to induce customers to cease doing business with the Company. Without a trade secret violation, the Complaint contains no facts indicating why or how Brentwood improperly used or possessed the Customer List and the claim cannot survive the Motion. *See id.* ("Without the trade secret aspect, [plaintiff's claim] essentially reads, 'Defendants' tortious interference was improper because they obtained and used some of our non-trade secret information.'").  Since CCMI's claims regarding Brentwood's use of the Customer List allege improper means, CCMI has not alleged a claim for tortious interference with business relations against Brentwood.

### 2.  Shaiper

As with the allegations against Brentwood, any claims of tortious interference with business relations claims against Shaiper are limited to allegations of use of the Customer List; the MUTSA preempts the remaining Non-Customer List Materials.  But, unlike Brentwood, Shaiper is a party to the Non-Interference Agreement and, as discussed above, CCMI alleges that she breached the Non-Interference Agreement by improperly obtaining and using the Customer List to steal away customers from CCMI.  These allegations properly assert improper means and suffice to permit the tortious interference claims against Shaiper to survive the Motion.  For these reasons, the Motions as to Count Ten are granted in part and denied in part.

### F.  Count Twelve – Unfair Competition

Looking to the Restatement (Third) of Unfair Competition, Missouri courts find that a claim for unfair competition by which someone might cause harm to the commercial relations of another may arise under three scenarios: (1) deceptive marketing; (2) infringement of trademarks and other indicia of identification; or (3) appropriation of intangible trade values including trade secrets and the right of publicity. *See Doe v. TCI Cablevision*, 110 S.W.3d 363, 368 (Mo. 2003) (en banc); Restatement (Third) of Unfair Competition § 1.  As with other torts under Missouri law, the MUTSA preempts any claims of unfair competition if those claims are based on the same facts as a party's trade secret claims. *ESM Techs., LLC v. Biova, LLC*, 2011 WL 13137369, at *1 (W.D. Mo. Jan. 12, 2011).

CCMI alleges that Defendants engaged in unfair competition by interfering with CCMI's employees and customer relations through misappropriation of CCMI's confidential, trade secret and proprietary information.  As the Court discussed above, the MUTSA preempts all allegations regarding the Non-Customer List Materials, and any claims founded upon use of the Customer List require allegations of nefarious behavior. As such, the Court's ruling in Count Twelve mirrors its ruling in Count Ten and finds that CCMI has not alleged improper use of the Customer List by Brentwood, but has alleged such use by Shaiper. For these reasons, the Motions as to Count Twelve are granted in part and denied in part.

### G. Count Thirteen – Unjust Enrichment

"To establish the elements of an unjust enrichment claim, the plaintiff must prove that (1) he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010).  A party's unjust retention of benefits will only occur if the benefits were "conferred (a) in misreliance[16] on a right or duty; or (b) through dutiful intervention in another's affairs; or (c) under constraint." *Id.* (quoting *Graves v. Berkowitz*, 15 S.W.3d 59, 62 (Mo. Ct. App. 2000)).

---

[16] "Misrelaince," in this context means mistake of fact. *Rolla Lumber Co. v. Evans*, 482 S.W.2d 519, 522 n. 1 (Mo. Ct. App. 1974).

CCMI alleges in the alternative[17] that the Company has been impoverished and deprived of its rightful property and earnings, to which Defendants have unjustly reaped the benefits.  The Court finds the Complaint satisfactory in alleging such a claim.

The Complaint lays out in appropriate detail how Defendants acquired and used the Misappropriated Information for their own benefit and to the detriment of CCMI.  As with the previous torts, the MUTSA preempts the Non-Customer List Materials claims. The Court dismissed the other tort claims against Brentwood because use of the Customer List required CCMI to allege some sort of improper means or use.  Unlike the previous tort claims, however, the elements of unjust enrichment contain no required nefarious or furtive act by the party unjustly enriched.  The tort requires only an inequitable or unjust benefit conferred upon a party that appreciates and retains the benefit.  Retention of that benefit may occur if there is "dutiful intervention of another's affairs," but the Court does not see dutiful intervention analogous to improper means. *Howard*, 316 S.W.3d at 436. The Complaint alleges that Brentwood dutifully intervened by assisting Shaiper in misappropriating the Customer List and using it to steal customers from CCMI to the benefit of Brentwood.

---

[17] CCMI does not explicitly plead unjust enrichment as an alternative claim in the Complaint, and the Court notes that it is not permissible for CCMI to recover on both its unjust enrichment claim and other claims such as the breach of contract claim. *See Chem Gro of Houghton, Inc. v. Lewis County Rural Elec. Co-op Ass'n*, 2012 WL 1025001, at *3 (E.D. Mo. March 26, 2012). Under the Federal Rules of Civil Procedure, however, "[a] party may set out two or more statements of a claim or defense alternatively or hypothetically" and "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).  Therefore, at this stage in the proceedings, CCMI's alternative pleading is permissible.

As for the first element of unjust enrichment, conferral of a benefit, both CCMI and Defendants argue strongly for either conferral or non-conferral, but neither party cites any cases under Missouri law with facts similar to CCMI's allegations, nor has the Court found any.[18]  Given the uncertainty of Missouri law on this element, and as CCMI has properly alleged the other elements of unjust enrichment, the Court is once again directed to anticipate how the Missouri Supreme Court would rule.

In anticipating a Missouri Supreme Court's ruling, the Court finds Missouri's treatment of other torts instructive.  As the MUTSA preempts CCMI's other tort claims, the Court can anticipate that the Missouri Supreme Court would find preemption appropriate for unjust enrichment as well.  The Court also looks to other non-Missouri courts interpreting this uncertain aspect of Missouri law for guidance.  In *Hallmark*, the district court sought to predict whether an unjust enrichment claim would be preempted by the MUTSA. 757 F. Supp. 2d at 916-17.  There, the district court ruled that any claims for conversion and unjust enrichment would be preempted by the MUTSA if the

---

[18] Defendants argue that New York courts, which share a similar unjust enrichment test with Missouri, would not yield an unjust enrichment claim under the facts of this case. *See, e.g.,* *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 447-48 (E.D.N.Y. 2011) (citing *Sperry v. Crompton, Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007)).  While Defendants are correct in presenting New York case law, there are other jurisdictions which have similar elements as Missouri's unjust enrichment law that would rule contrary to a New York court. *Compare id.* (citing *Ehrlich v. Froehlich*, 72 A.D.3d 1010, 1010-11 (N.Y. App. Div. 2010), *with In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 929 (E.D. Pa. 2012) (finding that under Florida law, there is no requirement that the benefit be bestowed through direct contact), *and Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996) (noting there is no element requiring that the benefit flow directly from the plaintiff to the defendants), *and In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) (concluding that Michigan law does not require a benefit to be conferred on defendants for an unjust enrichment claim).  As there are conflicting rulings in different jurisdictions, the Court affords Defendants argument little weight.

information constituted a trade secret. *Id.*  The Court concurs with the *Hallmark* court and concludes that CCMI's unjust enrichment claim is preempted to the extent it is based upon the Non-Customer List Materials, but the facts referencing the Customer List properly allege a conferral of a benefit.

Therefore, any allegations regarding the Non-Customer List Materials are preempted and dismissed; while any allegations based solely on the Customer List survive the Motions and may proceed.  For these reasons, the Motions as to Count Thirteen are granted in part and denied in part.

### H.  Count Eleven – Civil Conspiracy

A civil conspiracy claim under Missouri law requires that two or more persons, with an unlawful objective and after a meeting of the minds, commit at least one act in furtherance of the conspiracy, injuring the plaintiff. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 (8th Cir. 2005).  "The tort of civil conspiracy does not exist in its own right, '[r]ather, it acts to hold the conspirators jointly and severally liable for the underlying act." *Williams v. Bayer Corp.*, 541 S.W.3d 594, 612 (Mo. Ct. App. 2017) (quoting *Western Blue*, 367 S.W.3d at 22).  "The gist of the action is not the conspiracy," it is the wrong acts performed in furtherance of the conspiracy. *Id.* "Therefore, if the 'tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well.'" *Id.*

CCMI alleges that Brentwood and Shaiper acted in concert and, pursuant to a common design and scheme, conspired to engage in the unlawful actions set forth in the Complaint.  The Court notes that all underlying state action claims against Brentwood

will be dismissed except for Count Thirteen, unjust enrichment.  Seeing as the only valid claim alleged is unjust enrichment, the civil conspiracy claim may proceed, but only in reference to the unjust enrichment claim regarding the conferral and retention of the Customer List. *See Amesquita v. Glister-Mary Lee Corp.*, 408 S.W.3d 293, 304-05 (Mo. Ct. App. 2013) (affirming the lower courts decision to dismiss a claim of civil conspiracy because the plaintiff failed to allege facts that established a cause of action independent of the conspiracy).   For these reasons, the Motions as to Count Eleven are denied.

## IV.    Leave to Amend

In its brief submitted to the Court, CCMI stated that should the Court find the Complaint lacking in factual support for any of its claims, CCMI should be permitted to amend the Complaint.  CCMI has already amended the Complaint without leave of the Court.  Should it again seek to amend, the Court will require CCMI formally to move to amend its complaint by motion, allowing Defendants the opportunity to respond.

## <u>Conclusion</u>

For the foregoing reasons, the Court finds with respect to the Motions as follows:

<u>Count One</u>          DENIED as to all allegations against both Defendants.

<u>Count Two</u>          DENIED as to all allegations against both Defendants.

<u>Count Three</u>        GRANTED as to allegations against Brentwood involving the Customer List.

DENIED as to all allegations against Shaiper and allegations against Brentwood involving the Non-Customer List Materials.

<u>Count Four</u>          DENIED as to all allegations against Shaiper.

<u>Count Five</u>          GRANTED as to all allegations against Brentwood.

| | |
|---|---|
| <u>Count Six</u> | GRANTED as to the Customer List allegations against both Defendants. |
| | DENIED as to the Non-Customer List Materials against both Defendants. |
| <u>Count Seven</u> | GRANTED as to all allegations against Brentwood. |
| | DENIED as to all allegations against Shaiper. |
| <u>Count Eight</u> | DENIED as to all allegations against Shaiper. |
| <u>Count Nine</u> | GRANTED as to all allegations against Brentwood. |
| <u>Count Ten</u> | GRANTED as to all allegations against Brentwood and allegations against Shaiper involving the Non-Customer List Materials. |
| | DENIED as to allegations against Shaiper involving the Customer List. |
| <u>Count Eleven</u> | DENIED as to all allegations against both Defendants. |
| <u>Count Twelve</u> | GRANTED as to all allegations against Brentwood and allegations against Shaiper involving the Non-Customer List Materials. |
| | DENIED as to allegations against Shaiper involving the Customer List. |
| <u>Count Thirteen</u> | GRANTED as to the Non-Customer List Materials allegations against both Defendants. |
| | DENIED as to the Customer List allegations against both Defendants. |

The Court will issue an order giving effect to its ruling.

Dated:  August 8, 2018

KEVIN GROSS, U.S.B.J.